**BREW-WOLTMAN & COMPANY, INC. v NATIONAL POWER MACHINERY CO.**

Ohio Appeals, 8th Dist, Cuyahoga Co

No 18410. Decided Dec 15, 1941

F. E. Stearns, Cleveland, for plaintiff-appellant.

B. C. Sheperd, Cleveland, for defendant-appellee.

## OPINION

By MORGAN, J.

The plaintiff filed its action in the Municipal Court of Cleveland to recover a balance of $1350.00 alleged to be due on a contract of sale by the plaintiff to the defendant of certain power machinery located in Sherman, Texas. The defendant counter-claimed for $450.00, being the amount of the partial payment by the defendant to the plaintiff for said machinery. Defendant's counter-claim was based on allegations that the plaintiff, through its agent, misrepresented the condition and quality of the said power machinery and that there was, in fact, no contract of sale entered into by the parties.

The trial court disallowed the plaintiff's claim in its entirety, and gave the defendant a judgment on its counter-claim.

Evidence at the trial discloses that on October 12, 1939, the defendant, a Cleveland company, wrote a letter to the plaintiff in New York City, inquiring as to a generator and a Skinner Uniflow engine as to which there had been previous correspondence between the parties. The defendant closed its letter with the statement, "if still available, please quote your lowest price FOB cars". The plaintiff replied on October 16, 1939, to the effect that the unit was still available. On October 21, 1939 the defendant wired the plaintiff as follows:

"Yours October Sixteenth our customer desires inspect 125 KW Skinner Uniflow unit located Sherman Texas. Please wire lowest quotation with two weeks option."

To this telegram the plaintiff telegraphed the following reply:

"Retel Saturday Skinner Unit Sherman Texas have two weeks option for your customers inspection price eighteen hundred dollars where and as is to you. Advise name of customer and when inspection will be made so we can make necessary arrangements."

On October 23, 1939, the defendant sent the following telegram to the plaintiff:

"Retel Granting two weeks option 125 KW GE Skinner Unit price 1800 Dollars on foundation Sherman, Texas. Our customer is Home Packing Co., Toledo, Ohio, who are arranging with Eagle Indemnity Company Dallas Texas to make inspection."

On October 23, 1939, following the receipt of defendant's telegram of the same date, the plaintiff wrote the following letter to the defendant:

"Oct. 23, 1939.
Mr. B. R. Kohn,
National Power Machinery Co.
1914 Scranton Rd., Cleveland, Ohio
Dear Mr. Kohn:

We confirm our wire to you today concerning the 125 KW General Electric Skinner unit at Sherman, Texas, as per copy enclosed herewith. We also wish to acknowledge receipt of your telegram in which you advise your customer is the Home Packing Company of Toledo, Ohio and that they have arranged with the Eagle Indemnity Company of Dallas, Texas, to make the inspection.

We neglected to state in our telegram that the unit is on the property of the Southern Ice Co. at Sherman, Texas

but we presume that you have this information in your office. Mr. Clyde Lucas is the representative of the Ice Company at Sherman who should be contacted.

We trust that the inspection will be made at once and that a satisfactory report will be submitted to your customer so that the sale can be made.

Very truly yours
    BREW WOLTMAN & CO., INC.
    H. J. Woltman."

On October 30, 1939, the defendant sent the following telegram to plaintiff:

"Our customer Home Packing Company Toledo Ohio has made arrangements with Eagle Indemnity Company Dallas Texas, to have their Mr. James McDonald inspect today the 125 KW GE Skinner Uniflow unit located Southern Ice Company, Sherman Texas. Please accord facilities for this inspection."

Following the receipt of this telegram the plaintiff on Oct. 30, 1939, wrote a letter to defendant calling defendant's attention to the fact that the option on the unit would expire in a week's time and that the plaintiff was "not too sure that we can get an extension of the option." On Oct. 31, 1939, the defendant replied by letter that "it is essential you have an extension of the option—try to secure it now for we have an idea that our customer may be trying to get in touch with this unit through some other source."

On November 4, 1939, the plaintiff wrote the defendant that it had again requested an extension of the option and "will probably have some word on Monday".

On Nov. 6, 1939, the defendant sent the plaintiff the following telegram:

"Yours fourth we are exercising our option and mailing order 125 KW General Electric Skinner Uniflow unit Sherman Texas."

Also on Nov. 6, 1939, the defendant sent plaintiff the following letter:

"Nov. 6, 1939

Brew-Woltman & Co.
Mr. H. J. Woltman
50 Church St. New York City.
Dear Mr. Woltman.

We wired you today per enclosed confirmation and are appending hereto our formal order No. 140894 together with check amounting $450.00, being 25% on account purchase of the 125 KW General Electric generator direct connected to Skinner Uniflow engine, with its auxiliaries, as inspected by Mr. James McDonald, of the Eagle Indemnity Company in the plant of the Southern Ice Company, Sherman Texas, price—$1800.00—on foundation.

Very truly yours
    The National Power Machinery Co.
    B. R. Kohn, President."

Accompanying this letter the defendant enclosed its order for the unit, which contained a description and the words "as inspected by Mr. James McDonald of the Eagle Indemnity Company in the plant of the Southern Ice Company Sherman, Texas." The terms of the order were "Check No. 31790 amount $450.00, being 25% on account hereto attached, balance before removal."

Following the receipt of defendant's order by telegram and letter of Nov. 6, 1939, the plaintiff later deposited in its account defendant's check for $450 and on Nov. 8 exercised its option to purchase the machinery from the Southern Ice Company.

Before sending the telegram of Nov. 6th and the letter of the same date, enclosing signed order and check for $450.00, B. R. Kohn, President of the defendant company had a long distance telephone conversation on Nov. 6th with Clyde Lucas at Sherman, Texas. It will be recalled that Lucas was the person that plaintiff in its letter of Oct. 23, had designated "as the representative of the Ice Company at Sherman who should be contacted".

Mr. Kohn was asked by defendant's counsel to state his conversation with Lucas on Nov. 6th. Counsel for the plaintiff objected to the question and his objection was overruled. Mr. Kohn

then testified that he was told by Clyde Lucas "that the machine is in good condition and could be put into service without any repairs whatsoever. Then I asked him whether the Eagle Indemnity Company's engineer inspected that unit and he told me that they did and I asked him what examination was made, and he said the Eagle Indemnity Company's man looked over the cylinder and he examined the winding shaft and the bearing and he pronounced the unit O. K."

Counsel for defendant then moved that the answer be stricken from the record. After argument the court struck the answer from the record and assigned as his reason for so doing that Clyde Lucas was not an agent of the plaintiff authorized to make any representations as to the machinery and was only the name of the individual to be contacted for the purposes of inspection to be made by the Eagle Indemnity Company for defendant's customer. Later on redirect examination of Kohn, he was again asked to give his conversation with Lucas. The trial judge overruled the objection to this question on the ground that defendant's counsel in his cross-examination had gone into the subject of the conversation with Lucas and that "this witness should have the opportunity to state what that conversation was."

The only questions asked of Mr. Kohn by defendant's counsel on cross-examination, with relation to his telephone conversation with Lucas on November 6, 1939, were the following:

"Q. I understood you to say, on direct examination that on November 6th, you called Clyde Lucas at the Southern Ice Company, is that right?

A. Yes, I did.

Q. That is the same day that you sent your telegram saying that you exercised your option, is that right?

A. That's right."

We think it clear that the above two questions on cross-examination did not open the door for the introduction in evidence of the telephone conversation between Kohn and Lucas. If Mr. Kohn, on cross-examination, had been asked questions as to a part of the conversation, it might well have justified the court in permitting the witness to state the entire conversation. No such inquiry, however, was made of the witness and a question directed only to the date of the conversation did not open the door to evidence as to the entire conversation. Hamilton v State, 184 N. E. 170 (Ind.); Wagner v People, 30 Mich. 384; State v Chodas, 180 N. W. 536 (Minn.).

In the conclusions of law filed by the trial court in this case, it is evident that he changed his opinion as to the admissibility of the evidence of the conversation between Kohn and Lucas. In the fifth paragraph of the conclusions of law the court found that:

"5. Plaintiff had directed the defendant to contact a representative of the Southern Ice Company * * * . The defendant had the legal right to contact said ice company representative and to rely upon his representations, which it did. Such representations being untrue in fact and being the basis upon which the defendant placed its reliance when it submitted to plaintiff its counter-offer of November 6, 1939, gave to the defendant the legal right to rescind the transaction, had a valid contract been entered into."

It is our opinion that this conclusion of law is erroneous. It is based wholly on the letter sent by the plaintiff to defendant on Oct. 23, 1939, given above. On Oct. 21, 1939, the defendant wired the plaintiff that "our customer desires inspect 125 KW Skinner Uniflow unit located Sherman, Texas". The letter of Oct. 23, 1939, in reply, gave information as to the inspection. It stated that "Mr. Clyde Lucas is the representative of the ice company at Sherman who should be contacted". The sentence before and the sentence after the reference to Clyde Lucas deals wholly with the matter of the inspection. The offer of the plaintiff was to sell the machinery "where and as is". The de-

fendant was to make its own inspection prior to purchase and Lucas was named as "the representative of the Ice Company" not as the representative of the plaintiff whom the defendant's inspector would contact for purposes of the inspection.

Lucas was not the representative of the plaintiff and was not authorized to make a statement to the defendant regarding the condition of the machinery. Therefore the telephone conversation between Kohn and Lucas on Nov. 6th was not competent evidence in this case and should have been excluded.

The defendant also introduced in evidence the deposition of Leslie V. Miller who testified that he and not McDonald made the examination of the machinery for the Eagle Indemnity Company. He was permitted to testify as to the condition of the machinery as disclosed by his inspection and his testimony set forth a number of particulars in which the machinery was defective.

In offering this evidence, counsel for defendant argued for its admissibility on the ground that "this examination was made pursuant to the agreement of both parties that the Eagle Indemnity Company, or its representative should make the inspection." Defendant's counsel thus contended that Miller was as much the agent of the plaintiff as he was of the defendant or of the defendant's customer in making the inspection.

An examination of the above correspondence between the parties discloses that it cannot be so construed. Plaintiff suggested that the defendant should have an inspection made of the machinery prior to purchase and that the plaintiff would make the necessary arrangements for the inspection. On Oct. 31st, the defendant wrote the plaintiff and in the letter referred to "inspection that is being made by Mr. James McDonald of the Eagle Indemnity Company, Dallas, Texas, for our customer the Home Packing Co." Clearly, Miller, who instead of McDonald made the inspection for the Eagle Indemnity Company, was solely the representative of defendant or of defend-

ant's customer and was not the representative of plaintiff. It is therefore our conclusion that Miller's evidence as to what he found on his ▇▇▇▇▇▇▇ ▇ inspection of the machinery was not competent and it was error to admit it in evidence.

With the evidence of Miller, and the telephone conversation between Mr. Kohn and Clyde Lucas excluded, there is no evidence in the record of any misrepresentation by the plaintiff as to the condition of the machinery.

The next claim of the defendant is that no contract of sale was entered into by the parties. This requires a consideration of the further correspondence between the parties, subsequent to the defendant's telegram and letter of November 6, 1939.

On November 8, 1939, the plaintiff sent a telegram to the defendant, as follows:

"Order with check on account Skinner unit received this morning. Necessary state definite date unit will be removed and final payment made. Wire answer."

To this telegram the defendant, on November 8, 1939, replied by letter that it had requested its customer to give a definite shipping date, and it expected to get this information in a few days. On November 13, 1939, the plantiff wrote the defendant, acknowledging the receipt of the order and check for $450, and the defendant's letter of November 8th, 1939. The letter further stated that the plaintiff was advising the Southern Ice Company that the plaintiff believed shipping instructions would be forthcoming in three or four weeks, and that while this seemed to the plaintiff to be a reasonable period, the Southern Ice Company might object to this; in which event the plaintiff would have to be governed by the wishes of the Southern Ice Company and its action would be conditioned on the acceptance of the latter company. Plaintiff, in its letter, expressed its pleasure that the defendant was able to make the sale. and stated that it was "prepared of course, to cooperate to the fullest ex-

tent in meeting the customer's wishes providing they are reasonable."

On November 13, 1939, the defendant mailed a letter to the plaintiff which stated that there seemed to be a hitch with the defendant's customer in regard to the terms of payment, so that the defendant was not then in a position to give shipping instructions; but the letter also stated that "we assure you we will go through with our contract with you".

On November 20, 1939, the plaintiff sent a letter to the defendant again asking that definite shipping instructions and the payment of the balance due on the contract be not delayed and added:

"As you know, we have committed ourselves to the purchase and removal of this unit * * * and, we trust the matter can be handled so that we will not be placed in an embarrassing position with the owner."

The defendant replied by letter on November 21st stating that it had been unable to come to an agreement with its customer regarding terms of payment on this unit, so that "it looks as though the deal may fall through". This referred to the deal between the defendant and its customer. The letter concluded with the words "want to assure you we will pay the balance due prior to removal. We ask your cooperation."

This letter was answered by the plaintiff by letter dated November 22, 1939, in which the plaintiff again asked that the defendant should be more definite as to the date when the machinery would be removed and the balance of the purchase price paid.

On November 25, 1939, the defendant replied by letter as follows:

"Acknowledging receipt your communication, of November 22nd, relative to 125 KW volt engine generator unit at Sherman Texas. We know in a situation of this kind it is best to be frank with one another. We cannot give you definite date of removal nor are we in position to pay the balance due at this time.

In fact when our order was sent to you on Nov. 6th it was conditional that the unit be held for shipping instructions, and the balance paid prior to removal. We are willng to stand by our order however, if the conditions specified thereon are not satisfactory, you may return our check."

It is clear, therefore, that as late as November 25th, 1939, the defendant was willing "to stand by its order". The plaintiff did not see fit to act on the defendant's suggestion, and did not return the check for $450.00.

Mr. Kohn testified that he did not see the report of the Eagle Indemnity Company as to its inspection until some time in December, 1939, although the inspection was made on October 31st, 1939, and the report as to the inspection was sent by air mail to the defendant's customer on November 8th, 1939. Mr. Kohn also testified that the first time he had learned that the unit was not in good condition was in a conversation with a representative of the Skinner Company, the manufacturer of the unit, on December 11, 1939, and that he saw a copy of the Eagle Indemnity Company report for the first time a few days afterwards.

On December 20, 1939, the defendant wrote a letter to the plaintiff, as follows:

"With further reference to the 125 KW Skinner uniflow unit which we purchased from you, located at Sherman, Texas, we have just received information directly from the Skinner Engine Company that the engine had a slug of water and the shaft is sprung.

We are very much surprised to receive this information and feel we should have been informed of these conditions for if our deal had gone through with our original customer we would have been confronted with a very bad situation.

Prior to sending you our order on this unit, the writer phoned Mr. Clyde Lucas of the Southern Ice Company to make certain regarding the condition of this unit, and he mentioned that the unit was absolutely in first class

condition and on his representation we forwarded to you our order.

In view of this situation, we do not want the unit under any circumstances and request that you kindly return order and down payment."

Defendant's letter of December 20th contained the first intimation in the correspondence that the defendant would not go through with the contract of sale, and also the first reference to the telephone conversation of November 6th between Mr. Kohn and Clyde Lucas. The letter makes clear that the sole reason of the defendant for asking the return of this order for the machinery and of the $450.00 check which accompanied it, was the misrepresentation made by Clyde Lucas in the telephone conversation to the effect that the machinery was "in first class condition".

On January 2, 1940, January 17, 1940, and February 13, 1940, the defendant mailed letters to the plaintiff, in each of which it requested the return of its down payment of $450.00. In the letter of February 13th the defendant stated:

"also cannot understand how Mr. Clyde Lucas of the Southern Ice Company could represent this unit in good condition when we have received information that the shaft is sprung, in addition to other defects in the engne. It was on the strength of his representation that we forwarded our order to you on the unit."

On March 11, 1940, the plaintiff wrote to the defendant and stated that plaintiff had attempted to find another buyer for the unit "which we would have been glad to do as a favor to you," but, it had not been able to do this, and that "now a demand has been made on us by the Southern Ice Company through their attorneys for payment of the balance due and immediate removal of the unit. * * * This places us in a position where there is nothing we can do but make the same demand on you and we must, therefore, ask you to remit to us immediately the balance of $1350.00 due on the purchase and arrange for the removal of the unit without delay. Unless this payment is received from you within five days from date we shall be obliged to pass the matter to our attorney for his handling, as the matter cannot be delayed longer."

Plaintiff's letter disclaimed any responsibility for any representations made by Mr. Clyde Lucas of the Southern Ice Company, and added that "the unit was purchased by you from us and not from the Southern Ice Company".

The defendant replied to this letter on March 14, 1940. In this letter the defendant took the position that the plaintiff had never accepted the defendant's order for the unit; that plaintiff's telegram of November 8th, 1939, after the receipt of defendant's order of November 6th, 1939, requesting the defendant to "state definite date unit will be moved and final payment made" constituted a counter offer which was never accepted by the defendant.

This letter of March 14, 1940, is rather remarkable for two things. First, it marked the first time that the defendant had made any claim that it had never agreed to buy the machinery, and second, the letter made no reference to the condition of the machinery or to the telephone conversation with Clyde Lucas on November 6, 1939, the two things which, in defendant's previous letters, furnished the only reasons given by the defendant for its failure to go through with the contract.

All of the negotiations between the parties were conducted by correspondence and the above contains substantially all of the relevant correspondence.

November 6th, 1939, was the last date of the two weeks option and by its telegram of November 6, plaintiff contends that the defendant accepted the option according to its terms and this required the plaintiff to exercise its option expiring on the same date to purchase the machinery from the Southern Ice Company. The plaintiff. following the receipt of the defendant's telegram and letter, exer-

292

cised its option to purchase by wiring the Southern Ice Company to that effect. This was followed by a letter enclosing plaintiff's check to the ice company in part payment.

Mr. Kohn testified at the trial that he had the word of defendant's customer "that the machinery is sold providing it was in good shape" and inasmuch as he had been told by Lucas that defendant's inspector would report the machinery to be in good shape, Mr. Kohn "considered the machinery sold". Such being Mr. Kohn's understanding at the time it is unlikely that he would fail to tie up the machinery by contract on the last day of the option.

There is good authority for the proposition that the defendant, by its telegram of November 6th, ▆▆▆▆▆▆ ▆ which stated that the defendant was "mailing its order" did not thereby reserve the right to change or to add to the terms of the option which defendant's telegram accepted without qualification.

In 12 American Jurisprudence 532, it is stated:

"After an order is accepted, a proposal by the offerer of the modification does not affect the contract unless such proposal is assented to by the other party. Where an offer is accepted without objection or condition, the party making the offer has the right to understand that the acceptance was according to the terms of the offer."

See also Barnum Iron Works v Prescott Construction Co., 102 S. E. 860 (W. Va.); Williams v Burdick, 125 Fed. 844 (Ore.); Dalrymple v Scott, 19 Ore. Ap 477; Duggan v Matthew Cummings Co., 178 N. E. 825 (Mass.).

The trial court, however, in its third conclusion of law found that "the telegram of November 6th together with the letter of same date to which reference is made in said telegram, are to be read together * * * constituted a counter offer to plaintiff's original offer."

By stating in the telegram that the defendant was mailing its order, it is a possible, if not a probable construc-

tion that the defendant intended to modify its unconditional acceptance of the option by any modification found in the order.

If the defendant's letter and order of November 6, 1939, constituted a counter offer, was it ever accepted? The order contained the words, "Check No. 31790, amount $450.00, being 25% on account hereto attached, balance before removal". It is our opinion that when the plaintiff exercised its option to purchase the machinery from the Southern Ice Company and deposited in its account the defendant's check for $450.00, such action constituted an acceptance by the plaintiff of the defendant's order mailed on November 6, 1939, if the order is to be considered a counter-offer.

Rightly considered, the terms of the order were more favorable to the plaintiff than the option. Under both the option and the order the defendant had a reasonable time to remove the machinery, (§8431 GC) and while a payment of 25% of the purchase price accompanied the order, payment under the option as provided by the Sales Act (§8422 GC) would not have been due before delivery. The said section provides: "Unless otherwise agreed, delivery of the goods and payment of the price are concurrent conditions."

Therefore, whether defendant's telegram of November 6, 1939, be considered an unqualified acceptance of the option, or whether defendant's order mailed on the same date be considered a counter offer, a contract of sale was entered into by the parties for the machinery.

A contract of sale having been entered into by the parties, both were bound. The subsequent correspondence between the parties is consistent with this position. The plaintiff continued to ask that the defendant give a definite date for shipment and payment, and defendant, while stating that it was unable at the time to comply, repeatedly indicated that it would complete the purchase even if its deal with its customer should fall through. Even in its letter of December 20th, when the

defendant asked for the return of its order and down payment because of the misrepresentation by Clyde Lucas, the defendant referred to the machinery as the "unit which we purchased from you".

Consider what would have been the situation if the defendant had been successful in persuading its customer to purchase the machinery and the plaintiff had refused to make delivery on the ground that a contract of sale for the unit had never been entered into by the parties. We are confident that a court would have but little patience with such a claim and the defendant is in no better position.

The last defense of the defendant is that it is not obligated to pay the plaintiff the balance of the purchase price because the machinery was not "on foundation".

This claim is based on the defendant's telegram of October 23rd, 1939:

"Retel granting two weeks option 125 KW GE Skinner unit, price $1800.00 on foundation Sherman, Texas"

and on its order of November 6th where, following the description of the machinery it is stated: "as inspected by Mr. James McDonald of the Eagle Indemnity Company in the plant of the Southern Ice Company, Sherman, Texas, on foundation, $1800.00." It is conceded that the machinery had been dismantled some time before the inspection by the Eagle Indemnity Company. No claim is made that any part of the unit was missing.

Defendant's telegram of October 23, 1939, where the words, "on foundation" were first used, was in reply to the plaintiff's telegram of the same date that it had "two weeks option for your customer's inspection, price $1800.00 where and as is." Note that the sentence in which the words "on foundation" appears, begins with the words, "Retel granting etc.," which it is conceded means "In re your telegram granting etc." Accordingly, the words "on foundation" are found in a sentence in defendant's telegram which assumes to be only a reference to and

a restatement of the offer in plaintiff's telegram, as understood by the defendant. There is nothing to indicate that the plaintiff's offer was unsatisfactory in any particular, or that the defendant, by its telegram desired to change or to modify it.

It, therefore, seems to us that the words "on foundation" were not used by the defendant to indicate an additional requirement which would have an important bearing on the condition of the machinery, but they were used only with reference to price, as distinguished for instance from a quotation of price, "F.O.B. cars" as requested by the defendant in its first letter of October 12, 1939. •

If the cost of the unit to the defendant "on foundation" would have exceeded its cost after it was dismantled, then this claim of the defendant might have some validity; but the exact contrary is true. If this machinery were "on foundation" when inspected, it would have been necessary for the defendant to dismantle it before removal which would have meant an increase rather than a decrease of cost to the defendant.

This is even more evident in the use of the words "on foundation" in the order of November 6, 1939. The specification in the order is that the machinery shall be "as inspected" by an employee of the Eagle Indemnity Company "on foundation $1800.00". The inspection had been made by the Eagle Indemnity Company six days before the order was mailed by the defendant and the inspector of course had found that the machinery had been dismantled. That the defendant had not, at the time, seen a report of the inspection cannot modify the terms of the order.

It is difficult to understand how the defendant by the use of the words "on foundation" intended a requirement having an important bearing on the condition of the machinery when the specific provision of the order was that the machinery should be "as inspected" by its inspector when confessedly the unit was in a dismantled condition.

If there was any doubt as to this construction such doubt, in our opinion, is resolved by the subsequent correspondence between the parties. The evidence is uncontradicted that before the defendant wrote to the plaintiff its letter of December 20, 1939, requesting the return of its order and down payment the President of the defendant company had seen the report of the inspector and therefore knew that the machinery had been dismantled. Defendant, in its letter of December 20th stated its reasons for asking the return of the order and the down payment, but made no complaint that the machinery was not "on foundation" at the time of the inspection.

Later, in the defendant's letter of March 14, 1940, in reply to the plaintiff's letter stating that the claim would be placed in the hands of attorneys for collection, and when the defendant for the first time claimed that there had been no contract of sale executed by the parties, it again failed to mention that it was objecting to the machinery because it was not "on foundation". In fact, it was not before the petition had been filed in this case that the defendant, in its answer, for the first time stated as a defense that the machinery was not "on foundation".

The conclusion is inescapable that the use of the words "on foundation" is not a real defense, but is only an after-thought.

The defendant's unfortunate position in this case is due to the fact that it elected to exercise its option and to purchase the machinery before it or its customer had received the report of the inspection. The defendant, no doubt, believed that it was acting prudently in relying on the information given its president in the telephone conversation with Clyde Lucas. In a controversy however, with the plaintiff, the information conveyed to it by Lucas is no defense unless it can be shown that Clyde Lucas was the representative of the plaintiff authorized to make the statements made by him to the defendant. Possibly in a new trial the defendant may be able to offer additional evidence on this point. As the case stands there is no competent evidence that Lucas was the representative of the plaintiff or that the plaintiff, or its representative made any misstatements of fact as to the condition of the machinery.

The evidence of the conversations with Lucas and the deposition of the inspector as to the condition of the machinery should have been excluded and for these errors the case is reversed and remanded for a new trial.

SKEEL, J., concurs.
LIEGHLEY, PJ., dissents.