**Herman FILICE, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A02–0707–CR–591.**

Court of Appeals of Indiana.

May 7, 2008.

Transfer Denied July 10, 2008.

Elizabeth A. Gabig, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Karl M. Scharnberg, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

Rohypnol, a notorious date rape drug, causes temporary amnesia by inducing extreme feelings of intoxication in a user.[1] The facts of this case require us to address, for the first time, various legal issues surrounding a defendant's sexual contact with a woman who was in a Rohypnol-induced state of unawareness. While there is evidence in the record that the defendant knew or should have known that the woman was impaired, there is no evidence that he administered Rohypnol to her or knew that she was under the influence of that drug.

Appellant-defendant Herman Filice appeals his ten-year sentence and convictions for Criminal Deviate Conduct,[2] a class B felony, and Attempted Rape,[3] a class B felony. Specifically, Filice argues that (1) the trial court abused its discretion by denying his motion to dismiss the attempted rape charge on the ground that Indiana Code section 35–42–4–1(a)(2) is unconstitutionally vague; (2) the trial court abused its discretion by admitting the results of the victim's blood test showing the presence of Rohypnol; (3) the evidence was insufficient to sustain his convictions; (4) the trial court abused its discretion by refusing to give one of Filice's proposed jury instructions; (5) the trial court abused its discretion by finding the nature

and circumstances of the crimes to be an aggravating factor; and (6) his ten-year sentence is inappropriate in light of the nature of the offenses and his character. Finding Filice's sentence to be inappropriate in light of the nature of the offenses and his character and finding no other reversible error, we affirm in part, reverse in part, and remand with instructions to vacate the sentence and impose a term of eight years imprisonment for each conviction, with the sentences to run concurrently, for an aggregate term of eight years imprisonment.

## FACTS

K.S. met her mother for drinks and appetizers at a downtown Indianapolis restaurant on August 1, 2005. Josie Hovious, one of K.S.'s co-workers, met the women later in the evening and K.S.'s mother eventually left. Around 7:30 p.m., K.S. and Hovious walked to the Claddagh Irish Pub a few blocks away. As they entered, Hovious recognized an ex-boyfriend and she and K.S. approached the group of people he was with. Filice and his roommate, Amie Moorehead, were in that group. K.S. and Hovious stayed at the Claddagh for approximately thirty minutes and then walked a few blocks to the Slippery Noodle. K.S. was "happy" and "[d]idn't seem to be having any problem functioning" at that time. Tr. p. 235.

Upon entering the Slippery Noodle, the two women sat down at a table near the front of the bar and ordered drinks. Approximately ninety minutes later, Hovious's ex-boyfriend joined them at the table. At 9:30 p.m., K.S. walked back to the

---

1. Brooke A. Levy, *When Cute Acronyms Happen to Bad Legislation: The Reducing Americans' Vulnerability to Ecstasy "RAVE" Act,* 98 Nw. U.L. Rev 1251, 1264 (2004).

2. Ind.Code § 35–42–4–2.

3. Ind.Code §§ 35–41–5–1, 35–42–4–1(a)(2).

Claddagh to retrieve a bag of leftovers she had left there. Filice and Moorehead were seated in a booth in the restaurant when K.S. entered. K.S. briefly spoke to them, did not find the bag of leftovers, left the pub, and returned to the Slippery Noodle.

Approximately fifteen minutes later, Filice and Moorehead walked to the Slippery Noodle and sat at a table in the front room near the bar. Approximately twenty minutes later, K.S. approached Filice and Moorehead and told them that she had found the bag of leftovers. The trio engaged in casual conversation, which Hovious and her ex-boyfriend eventually joined. At some point, Filice passed Moorehead on the way to the restroom and asked, "[W]hich one do you think I could get?" *Id.* at 147. Moorehead replied that she thought he may be able to "be romantic with [K.S.]" but added that she "wouldn't bring that girl home." *Id.* 147–48. After that, Filice rejoined the group and he and K.S. talked exclusively for approximately thirty minutes. During that time, Filice went to the bar and bought K.S. at least one drink. *Id.* at 148–49.

Around 11:30 p.m., Filice, Moorehead, and K.S. walked to Nicky Blaine's Cocktail Lounge. By this time, both Filice and K.S. were "unsteady on their feet" and "swaying back and forth." *Id.* at 152. As they entered Nicky Blaine's, Moorehead saw someone she knew and began to talk to him. Filice followed Moorehead and K.S. sat alone on a sofa. While Moorehead was talking to her friend, she glanced at K.S. and "noticed [K.S.], um, sitting on the sofa and she was slumped down, just kind of low. He[r] body—he[r] feet—were kind of sticking out and her body—she was pulling herself upright. And he[r] purse and [t]he [bag of leftovers] were just kind of on the floor." *Id.* at 155. A Nicky Blaine's employee noticed K.S.'s condition

and told Filice, "I saw her come in with you and you need to get her out of here.... She looks in pretty bad shape and [is] disturbing the other customers, and you brought her in, so you need to get her home." *Id.* at 157.

Filice, Moorehead, and K.S. took a taxi to Filice and Moorehead's apartment. When they entered the apartment, Moorehead noticed that K.S. was not lucid:

> There are moments throughout the night, again, where she was lucid and calm and very focused and present. And then there were moments where she was not. She was gone, her eyes were blank. She wasn't controlling her posture very well. And when we got back to the apartment it appeared that she was back at that state where she wasn't controlling her posture very well, and she wasn't quite present.... She was just very limp. She just seemed, you know, limp, not very strong. She just didn't seem sturdy. There wasn't any swaying, but it—she just didn't seem steady on her feet.

*Id.* at 165.

While Filice was on the telephone with his girlfriend, Moorehead asked K.S. if she wanted a ride home and K.S. somewhat nodded her head. Because K.S. had not verbally responded, Moorehead repeated the question and eventually saw K.S. nod affirmatively. Moorehead told K.S. that she was going to use the restroom but that she would take K.S. home shortly.

When Moorehead emerged from the restroom approximately five minutes later, she saw movement in Filice's bedroom. She looked into the bedroom and saw Filice "on the edge of the bed, with his feet on the floor and [K.S.] on [Filice] with her legs around his waist." *Id.* at 169. Both Filice and K.S. were nude. Moorehead noticed that K.S. was not moving and that she "had that same posture [she] had had

in and out throughout the night, just very kind of limp . . . ." *Id.* Moorehead immediately walked into her bedroom, closed the door, and stayed there until the morning.

K.S. remembers very little of the evening except for "snap[shots or] flashbacks." *Id.* at 116. She does not remember going to Filice and Moorehead's apartment and does not remember removing her clothes. She has a brief memory of Filice "putting his . . . penis into [her] mouth and the next thing of him putting his hand inside [her]." *Id.* at 115. The next time she "came to," Filice was "straddling [her] chest" and she remembers "clinching [sic] [her] teeth" and "moving [her] head" to prevent him from forcing his penis into her mouth. *Id.* K.S. testified that she felt like she was "floating above [herself] . . . . It was as if I was watching, but I didn't have the ability to say anything and I didn't have the ability to do what I wanted to." *Id.* at 116. After it was over, Filice ordered a taxi for K.S., and the taxi picked her up from the apartment at approximately 3:00 a.m. While she does not remember the ride home, when Hovious called K.S.'s cell phone around 3:00 a.m., K.S. told her that she was in a taxi.

K.S. woke up the next morning "extremely sore, extremely tired, but just thick almost. Almost like if you were to have a wet blanket all over your entire body." *Id.* at 69. She tried to piece together the events of the previous night to make sense of her snippets of memory. Midway through the day, K.S. noticed that she had unexplained bruises, a swollen lip, and "was more sore than usual in plac[es] that I'm not normally sore." *Id.* at 72. K.S. went directly to bed after work.

The next day, K.S. met her mother and brother for lunch and they noticed that she was acting strangely. After some coaxing, K.S. told her mother what she remembered from the August 1 evening. Around 6:30 p.m., K.S. told her father what had happened and they called the police to report the crime. At 9:30 p.m., K.S. and her mother went to St. Vincent's Hospital (St. Vincent's) and K.S. was examined by Forensic Nurse Examiner Agnes Purdie. Nurse Purdie followed the sexual assault examination protocol and noted that K.S. had bruises on the right side of her mouth, her right shoulder, the left side of her chest, both thighs, and a bite mark on the inside of her left thigh.

Because K.S. told Nurse Purdie that there were large portions of the evening that she could not remember, Nurse Purdie suspected that K.S. had been drugged and ordered a blood and urine test. After examining the urine sample, AIT Labs (AIT) determined that it contained Rohypnol. Based on the concentration of the drug in the sample, Dr. Michael Evans, the founder and CEO of AIT, concluded that K.S. had been administered a two-milligram dose of Rohypnol on the night she was sexually assaulted.

The State charged Filice with six offenses on January 23, 2006. On August 14, 2006, Filice filed a motion to dismiss the class B felony attempted rape charge, arguing that Indiana Code section 35–42–4–1(a)(2) is "void for vagueness" and violates the applicable provisions of the United States and Indiana Constitutions.[4] Appellant's App. p. 58. Specifically, Filice argued that the statute defines rape as intercourse with a member of the opposite sex when "the other person is *unaware*

---

4. Filice also filed a motion to dismiss Count II—the class B felony criminal deviate conduct charge—for the same reasons, which the trial court denied. However, Filice was ultimately acquitted of that charge and, thus, does not challenge the trial court's denial of his motion to dismiss that count.

that the intercourse is occurring." *Id.* (emphasis in original). Filice contended that "[p]ersons of common intelligence would necessarily be forced to guess at the meaning of the term 'unaware' and differ as to its application[; thus, t]he language in this statute is not sufficiently definite to inform a person of ordinary intelligence as to conduct which is prohibited." *Id.* A hearing regarding the motion to dismiss was held on August 18, 2006, and the trial court denied Filice's motion on December 18, 2006.

A three-day jury trial began on April 23, 2007, and the jury convicted Filice of class B felony criminal deviate conduct and class B felony attempted rape. A sentencing hearing was held on June 13, 2007, and the trial court sentenced Filice to concurrent ten-year sentences on each count. Filice now appeals.

## DISCUSSION AND DECISION

### I. Constitutionality of Indiana Code section 35–42–4–1(a)(2)

Filice argues the trial court erred by denying his motion to dismiss the attempted rape charge because Indiana Code section 35–42–4–1(a)(2) is unconstitutionally vague pursuant to the Fifth and Fourteenth Amendments to the United States Constitution and Article I, sections 12 and 13 of the Indiana Constitution. Specifically, Filice contends that the statute is unconstitutional because it "does not provide fair notice that attempting to engage in sexual intercourse with a person who is able to walk, communicate and perform other routine tasks ... is proscribed because that person is 'unaware' due to the effects of a drug there's no evidence the defendant knew [about]." Appellant's Br. p. 31.

■ We review a trial court's denial of a motion to dismiss for an abuse of discre-

tion. *Haywood v. State,* 875 N.E.2d 770, 772 (Ind.Ct.App.2007). An abuse of discretion occurs where the decision is clearly against the logic and effect of the facts and circumstances or when the trial court has misinterpreted the law. *Id.*

■ A person who knowingly or intentionally has sexual intercourse with a member of the opposite sex when the other person is unaware that the sexual intercourse is occurring commits rape, a class B felony. I.C. § 35–42–4–1(a)(2). When reviewing a defendant's challenge to the constitutionality of a criminal statute,

> the reviewing court begins with a presumption of constitutionality. The burden to rebut this presumption is upon the challenger, and all reasonable doubts must be resolved in favor of the statute's constitutionality. A statute will not be found unconstitutionally vague if individuals of ordinary intelligence would comprehend it adequately to inform them of the proscribed conduct. The statute need only inform the individual of the generally proscribed conduct; it need not list with exactitude each item of conduct prohibited. A statute is void for vagueness only if it is vague as applied to the precise circumstances of the instant case. Likewise, federal vagueness analysis involves an inquiry into whether the prohibitions are clearly defined.

*Glover v. State,* 760 N.E.2d 1120, 1123 (Ind.Ct.App.2002) (citations omitted).

In *Glover,* we recognized that the term "unaware" had not been defined by the legislature for purposes of Indiana Code section 35–42–4–1(a)(2). *Id.* at 1124. Therefore, we adopted a dictionary definition of the term—"not aware: lacking knowledge or acquaintance; unconscious"—and held that the victim must be " 'unaware' that the sexual act is occurring" for a defendant to be guilty of rape pursuant to the statute. *Id.*

Filice emphasizes the testimony of Dr. Evans who testified that Rohypnol is "not a true sedative. It's not meant to put you to sleep...." Tr. p. 504. Dr. Evans emphasized that a person under the influence of Rohypnol experiences a relaxation effect, causing the user to physically relax their body. *Id.* at 506. Additionally, a user will "float in and out of [ ] consciousness" and the drug impairs memory "so you don't remember everything as the drug wears off." *Id.* Dr. Robert Julien, an expert anesthetist, testified that a person under the influence of Rohypnol may initiate a sexual encounter and later forget. *Id.* at 632. He identified this state as "conscious awareness in the absence of memory." *Id.*

Filice argues that Indiana Code section 35–42–4–1(a)(2) is unconstitutionally vague because

> [n]o person contemplating engaging in sexual activity could conform his or her conduct to avoid violating a statute that proscribes contact with someone who outwardly appears to be functioning adequately by performing routine tasks and who consents to or even initiates sexual contact, but is later unable to remember doing so.

Appellant's Br. p. 33. The State argues, and we agree, that Filice's argument "might be compelling were it *not* for the fact that K.S. was not in a condition where she appeared to be functioning normally." Appellee's Br. p. 25 (emphasis added). Instead, as Moorehead testified, K.S. was verbally unresponsive, slumped down on a couch, and "wasn't quite present" approximately five minutes before Filice attempted to rape her. Tr. p. 165, 166–67. Moorehead emerged from the bathroom to find K.S. and Filice naked in his bedroom, and K.S. had "that same posture [she] had had in and out throughout the night, just very kind of limp ... her back curved, like—it was like kind of a hump, like she was just hunched over." *Id.* at 169. K.S. has no recollection of that scene. *Id.* at 60.

■ Filice correctly notes that there is no precedent applying Indiana Code section 35–42–4–1(a)(2) to a conscious victim's Rohypnol-induced state of awareness. Cf. *Glover*, 760 N.E.2d at 1124 (applying the statute to a defendant who raped a woman who had lost consciousness due to extreme intoxication). Thus, he argues that the statute is unconstitutionally vague because it cannot fairly be construed to adequately inform an individual of ordinary intelligence that sexual intercourse with a conscious individual under the influence of Rohypnol is proscribed.

We initially note that our Supreme Court has suggested in dicta that a defendant charged under the first subsection of the rape statute for raping a woman who was extremely intoxicated but *not* unconscious could have, alternatively, been charged under the second subsection of the statute because of her lack of awareness. *Bryant v. State*, 644 N.E.2d 859, 860 n. 1 (Ind.1994) (noting that "[g]iven [the victim's] illness and intoxication, we can envision a charge under subsection (2) as well"). Furthermore, the legislature's decision to use the word "unaware" in the second subsection instead of using the word "unconscious" is telling and leads us to conclude that the term includes, but is not limited to, unconsciousness. Because Indiana Code section 35–42–4–1(a)(2) requires that the victim be " 'unaware' that the sexual act is occurring[,]" *Glover*, 760 N.E.2d at 1124, and Rohypnol can result in a victim's outwardly-apparent state of unawareness, we conclude that the language of the statute is adequate to inform an individual of ordinary intelligence that sexual intercourse with an individual in a Rohypnol-induced state of unawareness is pro-

scribed. Thus, the trial court did not abuse its discretion when it denied Filice's motion to dismiss.

## II. Results of Drug Test

Filice argues that the trial court abused its discretion by admitting State's Exhibit 8—the report indicating that K.S.'s urine sample tested positive for Rohypnol. Specifically, Filice argues that (1) the urine sample's chain of custody was inadequate to support admitting the report and (2) admitting the report unduly prejudiced him because it led to the unsupported inference that he drugged K.S.

■ The decision to admit or exclude evidence lies within the trial court's sound discretion and is afforded great deference on appeal. *Bacher v. State,* 686 N.E.2d 791, 793 (Ind.1997). Filice objected to the admission of the report at trial, arguing that the urine sample's chain of custody was inadequate and that the report was unduly prejudicial. Tr. p. 492–93. On appeal, Filice's argument focuses on the chain of custody of K.S.'s urine sample. The urine sample was not admitted at trial and, instead, the State presented a report detailing the toxicology results of the sample. While physical evidence need not be offered into evidence for a report to be admissible, the State must present evidence that the doctor or someone in authority was present at the taking of the specimen and demonstrate the specimen's chain of custody. *Baker v. State,* 449 N.E.2d 1085, 1087 (Ind.1983).

■ Physical evidence is admissible "if the evidence regarding its chain of custody strongly suggests the exact whereabouts of the evidence at all times." *Culver v. State,* 727 N.E.2d 1062, 1067 (Ind. 2000). In other words, the State must give "reasonable assurances that the property passed through various hands in an undisturbed condition." *Id.* Because the State need not establish a perfect chain of custody, slight gaps go to the weight, not the admissibility, of the evidence. *Id.* There is a presumption of regularity in the handling of exhibits by public officers. *Murrell v. State,* 747 N.E.2d 567, 572 (Ind. Ct.App.2001). Thus, merely raising the possibility of tampering is insufficient to make a successful challenge to the chain of custody. *Cockrell v. State,* 743 N.E.2d 799, 809 (Ind.Ct.App.2001).

Filice argues that the "record does not reveal anything that happened to the urine sample from the time K.S. provided it to [Nurse] Purdie at St. Vincent's until it arrived at AIT." Appellant's Br. p. 19. At trial, Nurse Purdie testified that she collected the urine sample from K.S. in a tube, sealed it, dated it, and "the tube [ ] goes from my hand and [I] call and tell [Mid–America Laboratories (Mid–America) ] that it's coming." Tr. p. 414. St. Vincent's owns Mid–America and the lab "provides all the laboratory work for those hospitals." *Id.* at 486. Dr. Evans testified that AIT received K.S.'s urine sample from Mid–America at 10:56 a.m. on August 4, 2005—no more than twelve hours after the sample was taken. *Id.* at 487. Filice argues that there is no information in the record regarding the urine sample's custody during those twelve hours. While he admits that the sample went from Nurse Purdie to Mid–America to AIT, he emphasizes that "[t]here is no information about the security of the storage facility at Mid–America or . . . about whether any procedures or protocols designed to ensure accurate specimen tracking were in place or followed by Mid–America." Appellant's Br. p. 19–20.

Filice directs us to *Baker v. State,* 449 N.E.2d 1085, 1088 (Ind.1983), in which our Supreme Court held that the trial court abused its discretion by admitting a hospital report showing the presence of sperm

in a sample taken from the victim when there was "a total absence of proof of the chain of custody of the exhibits...." However, the *Baker* court based its holding on the State's failure to present any evidence regarding the sample's collection or its subsequent transfer and testing.

■ Here, unlike in *Baker*, the evidence in the record shows that Nurse Purdie collected the sample, which was transported to Mid–America and then to AIT. While there is no evidence in the record regarding specific details of the sample's custody at Mid–America, Dr. Evans testified that AIT received the sealed sample with a "Bill of Lading that identifies each specimen." Tr. p. 481, 489–90. While the State definitely could have presented more specific evidence regarding Mid–America's possession, at most, Filice's argument raises the possibility of tampering, which we do not find to be sufficient. The jury was able to draw its own conclusions about Mid–America's handling of the sample and, under these circumstances, we do not find that the trial court abused its discretion by admitting Exhibit 8.

Additionally, Filice argues that the trial court's admission of Exhibit 8 "created the inference [that Filice] was also the person who administered [the Rohypnol] without K.S.'s knowledge in order to facilitate the commission of the accused crimes." Appellant's Br. p. 25. Evidence Rule 403 provides that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...."

■ While Exhibit 8 is certainly relevant to show K.S.'s state of awareness on the night she was with Filice, Filice argues that it should not have been admitted because it creates a significant danger of unfair prejudice. We first note that the State was careful not to argue to the jury

that Filice administered the Rohypnol to K.S. In fact, during closing arguments, it emphasized, "Do we know that [Filice] gave [K.S.] that Rohypnol? No. It doesn't matter because it was in her system. It was affecting her ability to perceive and to be aware and to consent." Tr. p. 770. Because Exhibit 8 was relevant to show K.S.'s state of awareness on the night she was with Filice and the State did not speculate that Filice administered the drug to K.S., we conclude that the exhibit's probative value was not substantially outweighed by the danger of unfair prejudice. Thus, the trial court did not abuse its discretion by admitting the evidence.

### III. Sufficiency

Filice argues that the State presented insufficient evidence to support his convictions beyond a reasonable doubt. Specifically, he challenges the evidence regarding (1) K.S.'s state of awareness during the attempted rape and (2) the force element of the criminal deviate conduct conviction.

■ When addressing sufficiency of the evidence challenges, we neither reweigh the evidence nor judge the credibility of the witnesses. *McHenry v. State*, 820 N.E.2d 124, 126 (Ind.2005). We consider only the probative evidence and reasonable inferences therefrom that support the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind.2007). If there is conflicting evidence, we consider that evidence only in the light most favorable to the judgment. *Id.* The evidence is sufficient if an inference may reasonably be drawn from it to support the judgment. *Id.* at 147.

### A. Attempted Rape

■ Filice argues that the State failed to present sufficient evidence that K.S. was "unaware" within the confines of the criminal rape statute. I.C. § 35–42–4–1.

He emphasizes that someone who has been administered Rohypnol can experience lucid and non-lucid states and there is no evidence that K.S. was in a non-lucid state and unable to consent when she and Filice had sexual contact.

■ A person who knowingly or intentionally has sexual intercourse with a member of the opposite sex when the other person is unaware that the sexual intercourse is occurring commits rape, a class B felony.[5] I.C. § 35–42–4–1(a)(2). We reiterate that while addressing Filice's challenge to the constitutionality of this statute, we held that the victim does not need to be unconscious for the sexual intercourse to constitute rape. Instead, as we held in *Glover*, Indiana Code section 35–42–4–1(a)(2) "requires that the victim [be] 'unaware' that the sexual act is occurring." 760 N.E.2d at 1124.

Dr. Evans testified that a person under the influence of Rohypnol can go in and out of consciousness but "even when you are in consciousness, you're not going to be responsive as if you weren't under the influence of this drug. You're going to be under the influence." Tr. p. 510. As previously detailed, Filice was ordered to remove K.S. from a bar because the she was so impaired that she was disturbing other patrons. *Id.* at 157. And Filice's roommate testified that after they arrived at the apartment, she asked K.S. if she wanted her to drive her home but K.S. was verbally unresponsive and "wasn't quite present." *Id.* at 165. Approximately five minutes later, Moorehead emerged from the bathroom to find K.S. and Filice naked in his bedroom, and K.S. had "that same posture [she] had had in and out throughout the night, just very kind of limp . . . her back curved, like—it was like kind of a

hump, like she was just hunched over." *Id.* at 169. K.S. has no recollection of that moment. *Id.* at 60.

Based on the evidence in the record, we conclude that the State presented sufficient evidence to prove that K.S. was unaware that the sexual act was occurring when Filice attempted to have intercourse with her. Probative evidence in the record shows that K.S. was impaired throughout the evening and that Filice was aware of her condition—he had specifically been asked to remove her from a bar because of her impairment. While Filice argues that K.S. may have been aware and able to consent at the time of the sexual encounter, his argument is a request for us to reweigh the evidence—an invitation we must decline when reviewing the sufficiency of the evidence. Thus, we conclude that the State presented sufficient evidence for the jury to conclude that K.S. was unaware that the sexual act was occurring and affirm Filice's attempted rape conviction.

### B. Criminal Deviate Conduct

Filice contends that the State presented insufficient evidence that he used force or the threat of force to compel K.S. to submit to deviate sexual conduct. He contends that while K.S. testified that she remembers clenching her teeth together to try to stop Filice from placing his penis in her mouth, "there is a lack of evidence [that] Filice knew her perceptions or recognized her limited physical movements were intended as resistance or refusal to engage in the activity." Appellant's Br. p. 13.

■ A person who knowingly or intentionally causes another person to perform or submit to deviate sexual conduct when the other person is compelled by

---

5. Additionally, Indiana Code section 35–41–5–1 provides that a person attempts to commit a crime when, acting with the culpability required for the commission of the crime, he engages in conduct that constitutes a substantial step toward the commission of the crime.

force or imminent threat of force commits criminal deviate conduct, a class B felony. I.C. § 35–42–4–2. The force employed need not be violent or physical and may be inferred from the circumstances. *Smith v. State*, 500 N.E.2d 190, 192 (Ind.1986). It is the victim's perspective, not the assailant's, from which the presence or absence of forceful compulsion is to be determined. *Tobias v. State*, 666 N.E.2d 68, 72 (Ind. 1996). This is a subjective test that looks to the victim's perception of the circumstances surrounding the incident in question. *Id.* Thus, the issue is whether the victim perceived the aggressor's force or imminent threat of force as compelling her compliance. *Id.*

At trial, K.S. testified that Filice straddled her chest with his legs and she "felt like he was choking me and he was trying to force his penis in my mouth." Tr. p. 61. In response to his force, K.S. began "pushing into the bed as far as I could and, like, pulling away, uhm, and clinching [sic] my mouth shut." *Id.* She acknowledged that Filice's penis entered her mouth. *Id.* at 95. While Filice argues that he could not tell that K.S. was resisting, as previously noted, our Supreme Court has held that the *victim's* subjective perception of the circumstances, not the aggressor's, is determinative. Moreover, after the encounter, K.S. had bruises on the right side of her mouth, her right shoulder, the left side of her chest, both thighs, and a bite mark on the inside of her left thigh. These physical injuries are further evidence of the force Filice used to compel K.S. to engage in deviate sexual conduct. Thus, we conclude that the State presented sufficient evidence to sustain Filice's conviction for criminal deviate conduct.

### IV. Proposed Jury Instruction

Filice argues that the trial court abused its discretion by refusing to tender his second proposed jury instruction (the proposed instruction). Specifically, Filice contends that the proposed instruction clarifies the mens rea element of the attempted rape charge by "add[ing] as an element of the crime [that t]he defendant knew or should have known that [K.S.] was unaware that said conduct was occurring." Appellant's Br. p. 26.

Jury instructions should inform the jury regarding the law applicable to the facts without being misleading and should enable the jury to understand the case and arrive at a just, fair, and correct verdict. *Williams v. State*, 755 N.E.2d 1128, 1131 (Ind.Ct.App.2001). The manner of instructing the jury lies within the sound discretion of the trial court and we will not reverse the trial court's ruling unless the charge to the jury misstates the law or is otherwise misleading. *Lewis v. State*, 759 N.E.2d 1077, 1080–81 (Ind.Ct. App.2001). Jury instructions must be considered as a whole and in reference to each other, and even an erroneous instruction will not be reversible error if the instructions taken as a whole do not misstate the law or otherwise mislead the jury. *Id.*

Before a defendant is entitled to a reversal, he must affirmatively show that the instructional error prejudiced his substantial rights. *Stringer v. State*, 853 N.E.2d 543, 548 (Ind.Ct.App.2006). "Errors in the giving or refusing of instructions are harmless where a conviction is clearly sustained by the evidence and the instruction would not likely have impacted the jury's verdict." *Ray v. State*, 846 N.E.2d 1064, 1070 (Ind.Ct.App.2006), *trans. denied.* An instruction error will result in reversal "when we cannot say with complete confidence that a reasonable jury would have rendered a guilty verdict had the instruction been given." *Id.*

While addressing a defendant's challenge to a jury instruction outlining the elements of rape, we recently held that a defendant "had to be aware of a high probability that [the victim] was unaware that sexual intercourse was occurring." *Gale v. State*, 882 N.E.2d 808, 816 (Ind.Ct. App.2008). Although the instruction given to the jury in Gale did not explicitly reflect this point of law, we concluded that the challenged instruction did not constitute reversible error because "[t]here was substantial evidence presented at trial that [the victim] was unaware that sexual intercourse was occurring and that Gale was aware of her condition." *Id.* at 818.

We agree with the Gale panel's analysis of the rape statute and its conclusion that a victim's unawareness is a material element of the crime, requiring a defendant to have been aware of a high probability that the victim was unaware that sexual intercourse was occurring. However, as in Gale, substantial evidence in the record here leads us to conclude that there was a high probability that Filice knew that K.S. was unaware while he attempted to have sexual intercourse with her. Specifically, a bartender ordered Filice to remove K.S. from the bar because she "looks in pretty bad shape and [is] disturbing the other customers . . . ," and Moorehead observed that K.S. "wasn't quite present" approximately five minutes before Filice attempted to rape her. Tr. p. 157, 165. Even more telling, when Moorehead emerged from the bathroom to find K.S. and Filice naked in his bedroom, Moorehead observed that K.S. was not moving and had the limp body posture that she had had during her previous non-lucid moments throughout the night. *Id.* at 169. Based on this evidence, we are confident that even if the trial court had given Filice's proposed instruction to the jury, it would have concluded that there was a

high probability that Filice knew that K.S. was unaware while he attempted to have sexual intercourse with her. Therefore, the jury still would have rendered a guilty verdict on the attempted rape charge and Filice has not been prejudiced by any error.

## V. Sentencing

Filice argues that (1) the trial court erred during sentencing by relying on the nature and circumstances of the crime as an aggravating factor and (2) his ten-year sentence is inappropriate in light of the nature of the nature of the offenses and his character.

### A. Aggravating Factor

In *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind.2007), *clarified on rehearing*, 875 N.E.2d 218 (2007), our Supreme Court held that trial courts are required to enter sentencing statements whenever imposing a sentence for a felony offense. The statement must include a reasonably detailed recitation of the trial court's reasons for imposing a particular sentence. *Id.* If the recitation includes the finding of aggravating or mitigating circumstances, then the statement must identify all significant mitigating and aggravating circumstances and explain why each circumstance has been determined to be mitigating or aggravating. *Id.* We review sentencing decisions for an abuse of discretion. *Id.* A trial court may abuse its discretion by entering a sentencing statement that includes reasons for imposing a sentence not supported by the record, omits reasons clearly supported by the record, or includes reasons that are improper as a matter of law. *Id.* at 490–91.

Our Supreme Court has held that the nature and circumstances of a crime can be a valid aggravating factor. *McCann v. State*, 749 N.E.2d 1116, 1120 (Ind.2001). However, a trial court must

give more than a generalized reference to the nature and circumstances. *Smith v. State*, 872 N.E.2d 169, 179 (Ind.Ct.App. 2007), *trans. denied.* The trial court may assign aggravating weight to the harm, injury, loss, or damage suffered by the victim if such harm was significant and greater than the elements necessary to prove the commission of the offense. *McCoy v. State*, 856 N.E.2d 1259, 1263 (Ind.Ct.App.2006).

 While giving its lengthy sentencing statement, the trial court mentioned the lasting impact Filice's offenses have had on K.S.:

> I think the one thing that did not go unnoticed by the Court, is what [K.S.] said and that is what a large impact you've had on so many people. I look out here, you know, a wonderful young lady, who has her whole life ahead of her and ... her innocence was taken away from her and she's lost two years of her life struggling to get back to where she was before all of this happened.

Tr. p. 848.[6] The trial court meticulously detailed the evidence regarding K.S.'s condition throughout the evening and concluded that

> that's the aggravating circumstance in this case and what it really hinges on is the condition of [K.S.] and *how unaware* she was that night, how absolutely clueless she was as to what was going on that night and for [Filice] then to take advantage of that situation is what makes this a unique case and certainly makes this an aggravating circumstance.

*Id.* at 852–53 (emphasis added). In light of the lasting impact the offenses have had on K.S. and the evidence regarding her extreme impairment on the night in question, we conclude that the trial court did not abuse its discretion by finding the nature and circumstances of the offenses to be an aggravating factor.

### B. Appropriateness

 Filice argues that his ten-year sentence is inappropriate in light of the nature of the offenses and his character and implores us to remand this case to the trial court with instructions for it to impose a fully-suspended sentence. Filice emphasizes that, at the time of the offenses, he was a well-respected college professor with no previous criminal history. Additionally, he reasserts that did not know that K.S. was under the influence of Rohypnol when he committed the offenses.

 When reviewing a sentence imposed by the trial court, we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). We have authority to "revise sentences when certain broad conditions are satisfied." *Neale v. State*, 826 N.E.2d 635, 639 (Ind.2005). When determining whether a sentence is inappropriate, we recognize that the advisory sentence "is the starting point the Legislature has selected as an appropriate sentence for the crime committed." *Weiss v. State*, 848 N.E.2d 1070, 1072 (Ind.2006). We must examine both the nature of the offense and the defendant's character. *Payton v. State*, 818 N.E.2d 493, 498 (Ind. Ct.App.2004). When conducting this inquiry, we may look to any factors appearing in the record. *Roney v. State*, 872

---

**6.** K.S. testified at the sentencing hearing, "My life is so different now." Tr. p. 794. She detailed the two years of counseling she has undergone and the medical treatment she has received for diabetes and fibromyalgia—medical conditions she had before the attack that have been aggravated as a result of immense stress. *Id.* at 794–799.

N.E.2d 192, 206 (Ind.Ct.App.2007), *trans. denied.* The burden is on the defendant to demonstrate that his sentence is inappropriate. *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind.2006).

A person who commits a class B felony shall be imprisoned for a fixed term of between six and twenty years, with the advisory sentencing being ten years. Ind. Code § 35–50–2–5. Here, the trial court sentenced Filice to the advisory sentence for each of his offenses and ordered the sentences to run concurrently, for an aggregate term of ten years imprisonment.

Regarding the nature of the offenses, Filice attempted to rape K.S. while she was unaware and compelled her to perform or submit to deviate sexual conduct by forcing his penis into her mouth. Although evidence suggests that there is a high probability that Filice knew that K.S. was unaware during the attempted sexual intercourse, there is no evidence that Filice administered Rohypnol to K.S. or knew that she was under the influence of that drug. Instead, the two had been talking and consuming alcohol together throughout the evening when Filice made the criminal decision to take advantage of a vulnerable woman. While we in no way suggest that Filice's actions were justified, as the State admits, "this is not the worst rape it has ever argued." Appellee's Br. p. 30. Thus, we conclude that Filice's crimes were not particularly worse than other offenses of this nature.

Turning to his character, at the time of the offense, Filice was a thirty-four-year-old college professor who enjoyed teaching and had spent eighteen years working toward various bachelor and doctoral degrees. Filice loved to teach because "it's not work to me ... it's pleasure." Tr. p. 832. However, he admitted that as a result of the offenses, "I'll never teach again ... I'm never going to be in a classroom

again." *Id.* at 833. Previous students wrote letters to the trial court describing Filice's engaging teaching style and his ability to inspire interest in even the most tedious subjects. Additionally, one of his colleagues described Filice as a "a bright, thoughtful, engaging young man." Appellant's App. p. 307.

Until the night in question, Filice had lived a law-abiding life with no prior criminal history. We have previously held that "leniency is encouraged toward defendants who have not previously been through the criminal justice system." *Beck v. State,* 790 N.E.2d 520, 522 (Ind.Ct.App.2003). While his offenses against K.S. on the night in question definitely show a dark side of Filice's personality, we find his thirty-four years as a law-abiding citizen and his position as a contributing member of society to be compelling.

The trial court struggled to impose a sentence in this case. At the sentencing hearing, it admitted that selecting a sentence was "difficult" and that "[even] in attempting to do justice for all people, [ ] I know I'm not going to satisfy anybody in this case, absolutely no one." Tr. p. 848, 853. We sympathize with the trial court's struggle to properly punish Filice for his serious offenses, which resulted in significant harm to his victim, while bearing in mind his generally-respectable character.

After immersing ourselves in the record for purposes of this appeal, we find Filice's ten-year sentence to be inappropriate in light of the nature of the offenses and his character. Because his offenses were not worse than other offenses of this nature and his character is persuasively mitigating, we find a downward departure from the advisory sentence to be appropriate. Thus, we remand this case to the trial court with instructions that it vacate the sentence and impose a term of eight years imprisonment for each conviction, with the

sentences to run concurrently, for an aggregate term of eight years imprisonment.

The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions to revise the sentence accordingly.

FRIEDLANDER, J., and ROBB, J., concur.