## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**ATTORNEYS FOR APPELLANT**

Spenser G. Benge
K. Aaron Heifner
Anderson, Indiana

**ATTORNEY FOR APPELLEE**

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Valonte Deshoun Smith, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | June 17, 2020 <br><br> Court of Appeals Case No. 19A-CR-2333 <br><br> Appeal from the Madison Circuit Court <br><br> The Honorable Angela Warner Sims, Judge <br><br> Trial Court Cause No. 48C01-1706-F3-1632 |

**Tavitas, Judge.**

## Case Summary

[1]     Valonte Smith appeals his conviction for rape, a Level 3 felony.[1]  We affirm.

## Issues

[2]     Smith presents seven issues for our review, which we revise and restate as follows:

> I.      Whether the trial court abused its discretion in denying the admission of certain evidence.
>
> II.     Whether the trial court abused its discretion in limiting Smith's discovery of certain facts regarding the recording device through a protective order.
>
> III.    Whether the deputy prosecutor committed prosecutorial misconduct.
>
> IV.     Whether the trial court properly instructed the jury.
>
> V.      Whether the evidence is sufficient to sustain Smith's rape conviction.
>
> VI.     Whether Smith received ineffective assistance of counsel.
>
> VII.    Whether Smith's sentence is inappropriate.

---

[1] Smith was also convicted of dealing in a narcotic drug, a Level 5 felony; however, Smith does not challenge this conviction on appeal and conceded at the jury trial that he was guilty of this charge.

## Facts

In 2014, L.H. began working as a confidential informant ("CI") and primarily worked with Detective Keith Gaskill with the Anderson Police Department and the Madison County Drug Task Force. In preparing L.H. to serve as a CI, Detective Gaskill took several safety measures, including giving L.H. a "safe word" to use in the event of an emergency. Tr. Vol. II p. 92.

L.H. met Smith in 2015 and previously purchased heroin from Smith.[2] During two of her previous encounters with Smith, L.H. and Smith used heroin together and then engaged in sexual intercourse. According to L.H., she did not have an agreement with Smith that sexual intercourse would occur instead of exchanging money; however, L.H. did not pay for the heroin when sexual intercourse occurred. On these occasions, Smith would grab L.H.'s arm as she was leaving, and L.H. "went along with the flow," allowing Smith to guide her before the two would engage in sexual intercourse. Tr. Vol. I p. 208.

In October 2016, when detectives sought to use L.H. as a CI during a controlled buy with Smith, detectives were not aware of the full nature of L.H.'s and Smith's previous interactions.[3] On the night of the controlled buy, Detective Gaskill equipped L.H. with audio and video recording devices and two one-hundred-dollar bills. Detective Gaskill was able to listen to a live audio feed

---

[2] In these previous encounters, L.H. was not working as a CI.

[3] Detective Gaskill testified that, had he known, he would not have used L.H. as the CI for the controlled buy with Smith.

during the controlled buy.[4] L.H. was aware that members of the drug task force would be nearby during the transaction.

[6] On October 3, 2016, L.H. met Smith at an intersection as Smith instructed. When L.H. arrived, Smith got into the passenger seat of L.H.'s vehicle. Smith then instructed L.H. to drive to an apartment complex in Anderson. L.H. and Smith walked into the apartment where Smith retrieved the heroin before the two disputed the price of the heroin. Prior to the controlled buy, Detective Gaskill instructed L.H. to try to purchase more than one gram of heroin. L.H. was initially anticipating spending $130.00 per gram;[5] L.H. told Smith: "If you show me some love, then, . . . I will spend the whole two [ ] hundred." Tr. Vol. I p. 222. L.H. responded affirmatively when asked by the deputy prosecutor if this phrase was "street lingo for getting more . . . drugs[.]" *Id.* Detective Gaskill similarly testified that L.H. was "ask[ing] for a little consideration" on the price. Tr. Vol. II p. 107. Ultimately, L.H. gave Smith the entire $200.00 but received only one gram.

[7] According to L.H., the following events transpired.[6] After L.H. and Smith exchanged the money and heroin, L.H. got up to leave, and Smith "grabb[ed

---

[4] Detective Gaskill testified at the jury trial that the quality of the live audio is "[n]ot very good." Tr. Vol. II p. 95. Detective Gaskill primarily uses the live audio to determine if the CI is in trouble. He is unable to review the video recording until after the recording equipment is returned to him.

[5] L.H. and Detective Gaskill believed $130.00 per gram to be the typical street price.

[6] This version of events comes from L.H.'s testimony at Smith's jury trial. As we will discuss further below, Smith argues the video contradicts portions of L.H.'s testimony.

L.H.'s] arm and pull[ed her] closer to [Smith]," which indicated to L.H. that Smith wanted L.H. "to stay and have sex." Tr. Vol. I pp. 223-24. According to L.H., she then told Smith no "several times." *Id.* at 224. L.H. also testified that she told Smith several times that she was in a hurry and needed to leave. Smith grabbed L.H.'s pants and asked L.H. if she was wearing a wire. L.H. responded: "You know me better than that." *Id.* at 226.

[8] Smith then "pull[ed] and guid[ed]" L.H. over to the couch near the front door. *Id.* With L.H.'s back to Smith, Smith pulled down L.H.'s pants. Smith then put his penis in L.H.'s vagina. L.H. did not yell for help or use the safety word because she knew Smith carried weapons, and L.H. was fearful that the situation would become violent if detectives stormed the apartment.

[9] L.H. then left the apartment and met with Detective Gaskill to give him the heroin and recording equipment. Detective Gaskill asked L.H. if Smith and L.H. had sexual intercourse, which L.H. denied because she was embarrassed and "still trying to register" what occurred. *Id.* at 230.

[10] Detective Gaskill returned to the police station and reviewed the audio and video recordings, which led him to conclude that sexual activity occurred during the controlled buy. Detective Gaskill spoke with his supervisor, Detective Chad Boynton, regarding his concerns. The following day, Detectives Boynton and Gaskill met with L.H., who admitted that Smith raped her. L.H. told detectives that she did not yell for help because she was afraid and embarrassed.

[11] L.H. underwent a sexual assault examination at Community Hospital. After comparing the sperm fractions collected from L.H.'s vagina with the sample collected from Smith pursuant to a court order, "the analyst concluded that the DNA profile is seventy-seven (77) billion times more likely if it originated from [L.H.] and [Smith] than if it had originated from [L.H.] and an unknown individual." Tr. Vol. II p. 62.

[12] On May 14, 2019, the State filed an amended information and charged Smith with Count I, rape, a Level 3 felony; and Count II, dealing in a narcotic drug, a Level 5 felony.[7] At the August 2019 jury trial, the recording of the controlled buy was played for the jury. Although the audio is difficult to understand at times, L.H. can be heard telling Smith "no" at least once; however, it is unclear what Smith said to L.H. prior to her saying "no." State's Ex. 10. L.H. asked Smith if she could return later, and L.H. asked Smith: "why won't you let me" leave and come back.[8] *See id.*

[13] The jury found Smith guilty of both Count I and Count II. At the sentencing hearing, the trial court found Smith's criminal history[9] as an aggravating factor

---

[7] The initial charging information, filed on June 27, 2017, alleged Count II, dealing in a narcotic drug, a Level 4 felony, instead of a Level 5 felony. No change was made to Count I.

[8] The precise wording is difficult to ascertain on the recording.

[9] According to Smith's pre-sentence investigation report ("PSI"), Smith's criminal history includes convictions for: possession of marijuana, a misdemeanor, in 2006; carrying a concealed weapon, a misdemeanor, and operating with a license suspended revoked or denied, a misdemeanor, in 2008; assault with a dangerous weapon, a felony, and domestic violence, a misdemeanor, in 2014; and possession of marijuana, a misdemeanor, in 2014. The misdemeanor and felony classifications for the offenses are not

and found no mitigating factors.[10]  The trial court sentenced Smith to twelve

years for Count I and four years for Count II to run concurrently for an

aggregate sentence of twelve years to be served at the Department of Correction

("DOC").  Smith now appeals.

## Analysis

### I.    *Admission of Evidence*

[14]    Smith argues that the trial court erred by prohibiting Smith from introducing

certain evidence.  "The trial court has discretionary power on the admission of

evidence, and its decisions are reviewed only for an abuse of that discretion."

*Lewis v. State,* 34 N.E.3d 240, 247 (Ind. 2015).  An abuse of discretion occurs

when the decision is clearly against the logic and effect of the facts and

circumstances.  *Nicholson v. State,* 963 N.E.2d 1096, 1099 (Ind. 2012).

### A.  *Third-Party DNA Evidence*

[15]    The trial court held a pretrial hearing regarding evidence Smith sought to

introduce pursuant to Indiana Rule of Evidence 412 ("Rule 412").  In his brief,

---

included.  Smith's PSI also includes several other arrests; however, no record of the outcome of those arrests
is provided.

[10] The trial court noted that Smith's criminal history was not the "lengthiest" or "most egregious."  Tr. Vol.
II p. 214.  In sentencing Smith, the trial court stated:

> And so, while I know that you have a lot of dispute with the lead charge in this case, that being the
> rape, but the Court is fashioning a sentence not only based on what the jury found you guilty of, but
> you put yourself in this position.  You came down to our community to deal drugs and however you
> want to characterize it, but you were taking advantage of people that are addicted or become
> addicted to those drugs and that continues to establish a market and with any kind of dealing drugs,
> comes risks.

*Id.* at 216.

Smith argues that information regarding third-party DNA found during L.H.'s sexual assault examination was included in his Indiana Rule of Evidence 412(b) motion. Upon review of the motion Smith cites to in the Appellant's Appendix, there is no mention of third-party DNA. Instead, Smith's Indiana Rule of Evidence 412(b) motion sought to introduce evidence regarding Smith's and L.H.'s prior sexual intercourse; the trial court allowed Smith to present this evidence. The third-party DNA issue, however, was discussed during a pretrial hearing. Prior to the beginning of Smith's jury trial, the trial court ruled that it would exclude the evidence at that time, "absent another hearing to determine its relevance and, or admissibility." Tr. Vol. I p. 100.

[16] On appeal, Smith argues that denying admission of the third-party DNA was an abuse of discretion. Our review of the record reveals that Smith has waived this issue for our review. After the trial court's preliminary ruling, Smith failed to raise the issue again during trial or make an offer of proof. *See Fowler v. State,* 929 N.E.2d 875, 881 (Ind. Ct. App. 2010) ("[Fowler] made no offer of proof with regard to her excluded testimony. Nor can the substance of her excluded testimony, along with its relevance to her defense, be discerned from the trial record."). Pursuant to Indiana Rule of Evidence 103(a)(2), "A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and: . . . (2) if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context." Accordingly, Smith has waived this issue for our review.

### B. Facebook Messages

[17] During Smith's jury trial, in response to L.H.'s testimony on cross-examination that she did not recall communicating with Smith months before the controlled buy, Smith sought to refresh L.H.'s recollection with Facebook messages L.H. sent Smith three months prior[11] to the rape. The State objected and argued that the messages were inadmissible because both the messages were not disclosed prior to trial as required by Rule 412.

[18] The State also made an offer of proof wherein L.H. testified that the exhibit appeared to be messages from her Facebook account; however, L.H. did not recall sending the messages and reviewing the messages did not refresh her recollection. The trial court, however, allowed Smith to ask L.H. in front of the jury whether the exhibit refreshed her recollection and, if it did, Smith would be able to question L.H. about the messages.

[19] In front of the jury, L.H. conceded that the Facebook messages appeared to have been generated from her account; however, L.H. did not recall sending the messages. After L.H. again testified her recollection was not refreshed, the parties had a conference with the trial court, and the trial court did not allow

---

[11] As can be seen in Figure 1, below, there is no date clearly visible on the paper copy of the proffered exhibit. At trial, Smith's attorney questioned L.H. about the messages, stating that they were dated three months prior to the controlled buy and that the date could be seen more clearly on the digital copy of the proffered exhibit. On appeal, the State does not appear to contest this timing.

Smith to admit the messages "[be]cause [they] violate[ ] [Rule 412]." Tr. Vol. II p. 14.

[20] On appeal, Smith argues the trial court abused its discretion in failing to admit the messages because: (1) the evidence was not proffered for an impermissible Rule 412 purpose but, rather, to impeach L.H.'s prior inconsistent testimony; (2) if the content of the messages was inadmissible under Rule 412, an exception to Rule 412 was applicable; and (3) the evidence was admissible as a prior inconsistent statement under Indiana Rule of Evidence 613. The State counters that the Facebook messages were not properly authenticated pursuant to Indiana Rule of Evidence 901(a).[12]

[21] We begin by discussing whether Evidence Rule 412 precluded admission of the Facebook messages. Evidence Rule 412 provides:

> **(a) Prohibited Uses.** The following evidence is not admissible in a civil or criminal proceeding involving alleged sexual misconduct:
>
>> (1) evidence offered to prove that a victim or witness engaged in other sexual behavior; or

---

[12] Indiana Rule of Evidence 901(a) states:

> In General. To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.

(2) evidence offered to prove a victim's or witness's sexual predisposition.

**(b) Exceptions.**

(1) *Criminal Cases.* The court may admit the following evidence in a criminal case:

(A) evidence of specific instances of a victim's or witness's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence;

(B) evidence of specific instances of a victim's or witness's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent or if offered by the prosecutor; and

(C) evidence whose exclusion would violate the defendant's constitutional rights.

Ind. R. Evid. 412.

[22] We disagree with the trial court that the Facebook messages are protected by Rule 412. The messages do not mention sexual behavior or discuss L.H.'s prior sexual conduct as seen in Figure 1 (partially redacted).



Figure 1

[23] The messages could perhaps be classified as suggestive or flirtatious; however, this is not the type of evidence of conduct prohibited under Rule 412. *See Zawacki v. State,* 753 N.E.2d 100, 103 (Ind. Ct. App. 2001) (holding that evidence Zawacki sought to offer, namely, letters from the victim to Zawacki's daughter requesting to be in a relationship and communicating the victim's attraction to Zawacki's daughter "does not concern any actual prior sexual activity or conduct on [the victim's] part," because the letters contain only written matter and, thus, did not fall within the confines of the Rape Shield Law), *trans. denied.*

[24] Accordingly, we address Smith's argument that the messages were admissible under Indiana Rule of Evidence 613(b), which states: "Extrinsic evidence of a

witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires. . . ." "'[W]hen a prior inconsistent statement is used to impeach a witness, it is not hearsay because the statement is not used to prove the truth of the matter asserted.'" *Estate of Dyer v. Doyle*, 870 N.E.2d 573, 578 (Ind. Ct. App. 2007) (quoting *Martin v. State*, 736 N.E.2d 1213, 1217 (Ind. 2000)). For example, in *Estate of Dyer*, we held that the witness's statement to an emergency room doctor was "arguably inconsistent with his testimony and could be used for impeachment purposes" under Evidence Rule 613(b). *Id.* The Facebook messages at issue here were arguably inconsistent with L.H.'s testimony regarding contact with Smith. Accordingly, the Facebook messages were admissible for impeachment purposes. *See id.*

Nonetheless, the trial court's failure to admit this evidence is harmless. *See Gray v. State,* 982 N.E.2d 434, 437 (Ind. Ct. App. 2013) ("Even when a trial court errs in excluding evidence, we will not find reversible error where that error is harmless; that is, where the error did not affect the substantial rights of a party."). The jury already received information regarding L.H.'s and Smith's prior sexual history. The jury also heard Smith ask L.H. whether she sent the Facebook messages to Smith three months prior. Although L.H. did not recall sending the messages, L.H. testified before the jury that it appeared to be her Facebook account that sent the messages. The messages themselves were innocuous and do not establish further contact between L.H. and Smith. The

exclusion of the exhibit containing the Facebook messages did not impact Smith's substantial rights.

## II.     Protective Order

[26]     Smith argues the trial court abused its discretion in granting the State's motion for a protective order.  "Generally, the grant or denial of a discovery motion is within the trial court's discretion and will be overturned only for an abuse of discretion."  *Rogers v. State,* 60 N.E.3d 256, 260 (Ind. Ct. App. 2016) (citations omitted), *trans. denied*.  "An abuse of discretion will not be found unless the decision is clearly against the logic and effect of the facts and circumstances."  *Id.*

[27]     In pretrial proceedings, the State sought a protective order regarding, in part, "the description and identity of the type of recording device utilized by investigators [which] could place ongoing, existing, and future investigations and informants at risk of compromise and safety."  Appellant's App. Vol. II p. 122.  Smith argued that the information was essential to his defense because a portion of the video was not in focus and did not capture the rape on camera; therefore, the defense needed to understand if L.H. had control over the video recording device.  The trial court entered an order prohibiting Smith from discovering the nature and design of the recording devices used during the controlled buy.

[28]    Pursuant to Indiana Trial Rule 26(C), the trial court may issue a protective order limiting broad discovery.[13] Our Supreme Court has established a "three-step test . . . for the discoverability of records by a criminal defendant in certain circumstances[.]" *In re Crisis Connection, Inc.,* 949 N.E.2d 789, 794 (Ind. 2011)*.* According to *Crisis Connection:*

> (1) there must be sufficient designation of the items sought to be discovered (particularity); (2) the requested items must be material to the defense (relevance or materiality); and (3) if the first two requirements are met, the trial court must grant the request unless there is a showing of paramount interest in nondisclosure.

*Id.* (quotations omitted).

[29]    Regarding the first factor, both the State and Smith knew Smith sought to obtain information regarding the nature and design of the recording devices. As

---

[13] Indiana Trial Rule 26(C) states:

> **(C) Protective orders.** Upon motion by any party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the county where the deposition is being taken, may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
>
> > (1)   that the discovery not be had;
> >
> > (2)   that the discovery may be had only on specified terms and conditions, including a designation of the time or place;
> >
> > (3)   that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery;
> >
> > (4)   that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters; . . .

to the second factor, regarding materiality, an item is "material" if it appears that it might benefit the preparation of the defendant's case. *Williams v. State*, 959 N.E.2d 360, 368 (Ind. Ct. App. 2012). Smith argues introduction of the device was material because "[L.H.] may have purposefully muffled the device during the time she was having sex with [Smith]," which, Smith argues, would "draw her credibility, motive, and intentions greatly into question." Appellant's Br. p. 35. The State argues that this information was immaterial to Smith's defense because "Smith was given a chance to question witnesses about the devices, and the jury was presented with an opportunity to consider the possibility that the devices had been tampered with by L.H. prior to or during her rape." Appellee's Br. p. 39.

[30] We are not convinced that L.H.'s potential manipulation of the camera offers a defense. Importantly, as the State points out, the trial court allowed Smith some latitude in questioning witnesses regarding the devices, and the discovery order was limited to the nature and design of the recording devices. *See* Tr. Vol. I pp. 39, 41 (Smith's attorney argued that he wanted to ask L.H. questions such as: "You knew where the device was, did you receive specific instructions regarding the device? What were those instructions? Have you used this device before?" to which the trial court responded: "I think this line of questioning, again, doesn't really get into the um, the nature and the design, where it was located, the particulars of the device, it has more to do with, which I think is part of the investigation then, the familiarity that [L.H.] may have had with the device."). Moreover, in closing argument, Smith's counsel argued, without

objection, that L.H. was controlling the device, that you could see several events during the controlled buy, and that "for some reason during the sex, the video goes blank." Tr. Vol. II p. 157. Smith was merely limited from presenting evidence regarding the nature and design of the recording equipment.

[31] Finally, we consider whether the State demonstrated a paramount interest in non-disclosure. "Whether a sufficient interest has been shown to prevent discovery will depend upon the type of interest put forth and the category of information sought. A legitimate interest in keeping the information or items confidential, for example, may suffice to deny discovery." *Williams,* 959 N.E.2d at 368 (quotations omitted). Here, the State argued at the hearing regarding the protective order that "the nature of the device is sensitive to ongoing [ ] investigations[.]" Tr. Vol. I p. 7. We agree. The information Smith sought—such as where the device was kept and how a CI works that device— could compromise investigations and endanger other CIs.

[32] Based on the foregoing, the trial court did not abuse its discretion in granting the State's protective order regarding the recording devices.

### III. *Prosecutorial Misconduct*

[33] Smith argues the deputy prosecutor committed prosecutorial misconduct during L.H.'s identification of Smith. When reviewing a claim of prosecutorial misconduct, we must determine whether the prosecutor: (1) engaged in misconduct that, (2) under all of the circumstances, placed the defendant in a

position of grave peril to which he or she would not have been otherwise subjected. *Ryan v. State,* 9 N.E.3d 663, 667 (Ind. 2014); *see also Nichols v. State,* 974 N.E.2d 531, 535 (Ind. Ct. App. 2012). "'Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct.'" *Nichols,* 974 N.E.2d at 535 (quoting *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006)). We measure the weight of the peril by the probable persuasive effect of the misconduct on the jury rather than the degree of impropriety of the conduct. *Id.*

[34] During L.H.'s testimony at trial, the following events transpired:

> [DEPUTY PROSECUTOR]: Okay . . . . Do you know the Defendant, Valonte Smith?
>
> [L.H.]: Yes.
>
> [SMITH'S COUNSEL]: Well, Judge. . . let the record reflect that [the deputy prosecutor] turned and pointed at [Smith] as he's asking the witness if she knows [Smith], and I would object to that in-court identification.
>
> THE COURT: Okay. Objection noted. Continue, [deputy prosecutor].
>
> [DEPUTY PROSECUTOR]: I noticed, ma'am, that you're having trouble looking –
>
> [L.H.]: I didn't even look over there, but yes I do.

[DEPUTY PROSECUTOR]: Okay. And we'll get to the, to the video and, and talk about that and everything like that, but you know someone by the name of Valonte Smith, correct?

[L.H.]: Yes.

[DEPUTY PROSECUTOR]: And he's in fact sitting over there?

[L.H.]: Yes.

Tr. Vol. I p. 204.

[35] Smith argues that the deputy prosecutor was "impermissibly suggestive" during L.H.'s in-court identification of Smith and that, as a result, the jury "was sure to see [Smith] as the man in the video, despite its poor quality, because [L.H.] had identified him at the direction of the Deputy Prosecutor." Appellant's Br. pp. 18, 38. Even if the deputy prosecutor impermissibly gestured to Smith when asking L.H. to identify Smith, Smith was not placed in a position of grave peril.

[36] Smith's argument regarding grave peril—that the jury was "sure" to see Smith as the man in the video despite its poor quality—is unpersuasive because Smith did not argue at any point during the trial that he was not the person in the video. In fact, in opening argument, Smith conceded that he was on the video dealing heroin. Thus, the alleged misconduct had no probable persuasive effect

on the jury, and Smith failed to demonstrate that he was subject to grave peril.[14] Smith has failed to meet his burden that the deputy prosecutor committed misconduct.

### *IV.    Jury Instructions*

[37]     Smith argues the trial court improperly instructed the jury.  The State proposed Instruction 5, and the trial court adopted the State's instruction as written over Smith's objection.  Instruction 5 stated:

> The presence or absence of forceful compulsion is to be determined from an *objective* and *reasonable* perspective of the victim, not the assailant.  You may consider the victim's perception of the circumstances surrounding the incident in question, but this must also be an *objective* and *reasonable* perspective under the circumstances.  The issue is whether under the circumstances presented the victim reasonably perceived the aggressor's force or imminent threat of force as compelling her compliance.

Appellant's App. Vol. II p. 141 (emphasis added).

[38]     In reviewing a trial court's decision to give or refuse tendered jury instructions, this Court considers: (1) whether the instruction correctly states the law; (2) whether there is evidence in the record to support the giving of the instruction; and (3) whether

---

[14] Smith argues that the improper identification tainted all future identifications of Smith, such as Detective Gaskill's identification.  At trial, Detective Gaskill was asked if he recognized Smith as the person from the video.  In light of the fact that Smith conceded in opening argument that he was in the video dealing heroin, we do not believe this testimony was impacted by the deputy prosecutor's and L.H.'s prior remarks.

the substance of the tendered instruction is covered by other instructions which are given.

*Guyton v. State*, 771 N.E.2d 1141, 1144 (Ind. 2002). "Instructing a jury is a matter assigned to trial court discretion, and an abuse of that discretion occurs when the instructions, as a whole, mislead the jury as to the law in the case." *Newbill v. State,* 884 N.E.2d 383, 394 (Ind. Ct. App. 2008) (citing *Ham v. State,* 826 N.E.2d 640, 641 (Ind. 2005)), *trans. denied.* "Jury instructions must be considered as a whole and in reference to each other, and even an erroneous instruction will not be reversible error if the instructions taken as a whole do not misstate the law or otherwise mislead the jury." *Filice v. State,* 886 N.E.2d 24, 37 (Ind. Ct. App. 2008) (citations omitted), *trans. denied.* "Before a defendant is entitled to a reversal, he must affirmatively show that the instructional error prejudiced his substantial rights." *Id.*

[39] Smith concedes the instruction "may correctly state the law, and there is evidence in the record which could be construed to support the giving of the instruction." Appellant's Br. p. 40. Smith argues, however, argues that the "instruction's interaction with other instructions . . . creates the problem." *Id.*

[40] Smith's argument is based on *Newbill v. State,* 884 N.E.2d 383, 393 (Ind. Ct. App. 2008), *trans. denied.* In *Newbill,* the trial court instructed the jury that:

> It is the victim's perspective, not the assailant's, from which the presence or absence of forceful compulsion is to be determined. This is a subjective test that looks to the victim's perception of the circumstances surrounding the incident in question. The issue is whether the victim perceived the aggressor's force or imminent

threat of force as compelling her compliance. The element of force may be inferred from the circumstances.

*Newbill*, 884 N.E.2d at 393. Our Court held that this instruction "may not properly reflect the perspective from which a jury should consider the evidence of forceful compulsion." *Id.* Instead, our Court held, "the 'perspective' for a jury's consideration of the evidence of forceful compulsion in a rape trial might better be described as either the 'objective perspective of the victim' or the 'reasonable perspective of the victim.'" *Id.* (footnote omitted). We discouraged trial courts from using this language as an instruction in the future. Regardless, we then held that, "read as a whole, the instructions properly informed the jury that it was to consider the testimony and evidence presented, and to judge that evidence in order to reach its conclusion of whether the State established, beyond a reasonable doubt, that Newbill knowingly or intentionally exerted force that compelled H.R. to submit to sexual intercourse." *Id.* at 394.

[41] We observe that here the trial court did not use the instruction found in *Newbill*; rather, the instruction given by the trial court addressed the concerns raised in *Newbill* and provided that it was both the reasonable and objective perspective of L.H. framed the question of forceful compulsion. Contrary to Smith's argument, the instruction did not "relieve[] the State of its burden as to proving each element objectively and beyond a reasonable doubt." Appellant's Br. p. 41. Accordingly, we find the trial court did not abuse its discretion by giving Instruction 5.

## V. *Insufficient Evidence*

[42] Smith argues the evidence is insufficient to support his rape conviction. When a challenge to the sufficiency of the evidence is raised, "[w]e neither reweigh evidence nor judge witness credibility." *Gibson v. State,* 51 N.E.3d 204, 210 (Ind. 2016) (citing *Bieghler v. State,* 481 N.E.2d 78, 84 (Ind. 1985), *cert. denied*), *cert. denied*. Instead, "we 'consider only that evidence most favorable to the judgment together with all reasonable inferences drawn therefrom.'" *Id.* (quoting *Bieghler,* 481 N.E.2d at 84). "We will affirm the judgment if it is supported by 'substantial evidence of probative value even if there is some conflict in that evidence.'" *Id.* (quoting *Bieghler,* 481 N.E.2d at 84)*; see also McCallister v. State,* 91 N.E.3d 554, 558 (Ind. 2018) (holding that, even though there was conflicting evidence, it was "beside the point" because that argument "misapprehend[s] our limited role as a reviewing court"). "We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Love v. State,* 73 N.E.3d 693, 696 (Ind. 2017) (citing *Drane v. State,* 867 N.E.2d 144, 146 (Ind. 2007)).

[43] Smith was convicted of rape, a Level 3 felony, pursuant to Indiana Code Section 35-42-4-1(a)(1), which states:

> Except as provided in subsection (b), a person who knowingly or intentionally has sexual intercourse with another person or knowingly or intentionally causes another person to perform or submit to other sexual conduct . . . when:

(1) the other person is compelled by force or imminent threat of force;

* * * * *

commits rape, a Level 3 felony.

[44] Smith argues that the evidence is insufficient to prove that Smith used force or the imminent threat of force to compel L.H. to have sexual intercourse and that L.H. did not consent. As our Supreme Court explained in *Tobias v. State,* 666 N.E.2d 68, 72 (Ind. 1996):

> [I]t is the victim's perspective, not the assailant's, from which the presence or absence of forceful compulsion is to be determined. This is a subjective test that looks to the victim's perception of the circumstances surrounding the incident in question. The issue is thus whether the victim perceived the aggressor's force or imminent threat of force as compelling her compliance.

"Further, in the sufficiency context, the force necessary to sustain a conviction of rape need not be physical and it may be inferred from the circumstances." *Newbill,* 884 N.E.2d at 392 (quotations and citations omitted).

[45] Here, there was sufficient evidence of force to sustain Smith's conviction. The jury was able to hear the audio recording in addition to L.H.'s testimony regarding the rape. L.H. can be heard on the recording telling Smith "no" at

least once.[15] *See* State's Ex. 10. L.H. stated several times that she needed to leave to go to the local high school. L.H., in an effort to leave, even asked Smith if she could leave and come back later. The recording also captured L.H. asking Smith why he will not allow her to leave. In his brief, Smith concedes that he "grabbed" L.H.'s arm and "guided" her to the couch.[16] Appellant's Br. p. 19. From these facts, a jury could reasonably conclude that Smith prevented L.H. from leaving and forced L.H. to comply with his demands.

[46] Smith's arguments that L.H. consented because: (1) there "is no evidence that [L.H.] was hit, injured, pushed down, held down, or otherwise physically overcome," Appellant's Br. p. 19; (2) Smith was merely acting in conformity with past consensual behaviors; (3) Smith touched L.H. only to look for a wire and not to compel sexual intercourse; (4) L.H. did not tell Smith "no" to having sexual intercourse; and (5) L.H. was scared of the detectives' presence causing violence, instead of *Smith's* violence, are merely requests for us to reweigh evidence, which we cannot do. Appellant's Br. p. 19; *see Gibson,* 51 N.E.3d at 210. Accordingly, we find the evidence is sufficient to support Smith's conviction for rape, a Level 3 felony.

---

[15] It is unclear on the recording what Smith says before L.H. says "no."

[16] Even if this action was consistent with Smith's and L.H.'s prior consensual encounters, L.H.'s testimony and the audio recording demonstrate that L.H. audibly contested Smith's actions.

## VI. Ineffective Assistance of Counsel

[47] Smith next argues that he received ineffective assistance of counsel because his attorney failed to cross-examine L.H. on several issues.[17] To prevail on a claim of ineffective assistance of counsel, the appellant must demonstrate both that: (1) his or her counsel's performance was deficient, and (2) the petitioner was prejudiced by the deficient performance. *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)), *reh'g denied*, *cert. denied*, 534 U.S. 830, 122 S. Ct. 73 (2001). The failure to satisfy either prong will cause the claim to fail. *Grinstead v. State*, 845 N.E.2d 1027, 1031 (Ind. 2006). Ineffective assistance of counsel claims, thus, can be resolved by a prejudice analysis alone. *Id.* To demonstrate prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Weisheit v. State,* 109 N.E.3d 978, 983 (Ind. 2018) (quoting *Strickland,* 466 U.S. at 694, 104 S. Ct. 2052). Finally, "[t]o support such a claim of ineffective assistance of counsel, it is often necessary to develop

---

[17] "'A postconviction hearing is normally the preferred forum to adjudicate an ineffectiveness claim.'" *McIntire v. State,* 717 N.E.2d 96, 101 (Ind. 1999) (quoting *Woods v. State,* 701 N.E.2d 1208, 1219 (Ind. 1998)). "Presenting such a claim often requires the development of new facts not present in the trial record. The assessment of such a claim requires a court to consider the overall performance of counsel and the reasonable probability that the alleged error affected the outcome." *McIntire*, 717 N.E.2d at 101. Because Smith has chosen to raise this issue on direct appeal, "the issue will be foreclosed from collateral review." *Id.* at 102 (quotations omitted).

facts beyond those contained in the trial record." *Jewell v. State,* 887 N.E.2d 939, 942 (Ind. 2008).

[48]    Smith argues that counsel rendered ineffective assistance by failing to cross-examine L.H. regarding whether: (1) the video was inconsistent with L.H.'s testimony that she told Smith "no" before he raped her; (2) L.H. said "no" to Smith's question regarding a wire and not to sexual intercourse; (3) "the tone and disposition of [L.H.'s] voice was the same before she had sex with Mr. Smith as it was after"; and (4) any threat of force L.H. may have felt came from fear the police may cause a shootout, and not from Smith.  Appellant's Br. p. 17.

[49]    Smith's counsel cross-examined L.H. on other issues regarding her credibility and on inconsistencies in her testimony.  "It is not our prerogative to second-guess deliberate and informed choices made by an attorney for tactical or strategic reasons." *Weaver v. State,* 432 N.E.2d 5, 8 (Ind. 1982).  Moreover, Smith has failed to demonstrate that he was prejudiced.  The jury was able to hear the audio from the controlled buy and L.H.'s testimony and discern on their own whether they found L.H. to be credible and whether L.H.'s testimony was inconsistent with the audio evidence.  Accordingly, Smith has failed to meet his burden to demonstrate that he received ineffective assistance of counsel.

## VII. *Inappropriate Sentence*

Finally, Smith argues that his sentence is inappropriate in light of the nature of the offense and Smith's character.[18]  Smith asks that we review and revise his sentence pursuant to Indiana Appellate Rule 7(B), which provides that we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence "is inappropriate in light of the nature of the offense and the character of the offender."  The defendant bears the burden to persuade this court that his or her sentence is inappropriate. *Wilson v. State*, 966 N.E.2d 1259, 1266 (Ind. Ct. App. 2012) (citing *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006)), *trans. denied.*

In Indiana, trial courts can tailor an appropriate sentence to the circumstances presented; the trial court's judgment receives "considerable deference."  *Sanders v. State*, 71 N.E.3d 839, 844 (Ind. Ct. App. 2017) (quoting *Cardwell v. State*, 895

---

[18] Smith makes two other arguments in his brief.  First, Smith also argues that the trial court did not comply with the requirements in *Harris v. State,* 659 N.E.2d 522, 527-28 (Ind. 1995), that the trial court should: (1) identify the aggravating and mitigating circumstances; (2) state the specific reason why the circumstances are aggravating or mitigating; and (3) articulate the balancing of the factors at sentencing.  As the State notes, however, *Harris* was decided prior to *Anglemyer v. State,* 868 N.E.2d 482, 491 (Ind. 2007), which held that the trial courts "no longer [have] any obligation to weigh aggravating and mitigating factors against each other when imposing a sentence" (internal quotations omitted).  Importantly here, the trial court entered a lengthy oral sentencing statement and articulated the aggravating and mitigating factors.  Smith's argument that the trial court did not ascribe the weight to be given to each factor is not required under *Anglemyer.*

Second, Smith argues that the trial court improperly considered the fact that Smith put himself in a situation to deal drugs as an aggravating factor.  We do not find support for Smith's argument that the trial court considered this an aggravating factor; the trial court was clear that Smith's criminal history was the sole aggravating factor.  Nonetheless, as the State points out, this argument would have been more appropriately framed as the trial court abusing its discretion, and because Smith does not outline this standard in his brief, we consider this argument waived.  *See* Ind. Appellate Rule 46(A)(8)(b) ("[t]he argument must include for each issue a concise statement of the applicable standard of review[.] . . .").

N.E.2d 1219, 1222 (Ind. Ct. App. 2008)), *trans. denied.* In conducting our review, we do not look to see whether the defendant's sentence is appropriate or "whether another sentence is *more* appropriate; rather the question is whether the sentence imposed is inappropriate." *Helsley v. State,* 43 N.E.3d 225, 228 (Ind. 2015) (citations and quotations omitted and emphasis supplied).

[52] We look to the statutory range established for the classification of the offense. The jury found Smith guilty of rape, a Level 3 felony; and dealing in a narcotic drug, a Level 5 felony. The sentence for a Level 3 felony ranges from three to sixteen years with an advisory sentence of nine years. Ind. Code § 35-50-2-5(b). The sentence for a Level 5 felony ranges from one year to six years, with an advisory sentence of three years. Ind. Code § 35-50-2-6(b). Here, the trial court imposed twelve years for the Level 3 felony and four years for the Level 5 felony, to run concurrently, for an aggregate sentence of twelve years.

[53] First, we consider the nature of Smith's offense. Smith sold L.H. heroin while, unbeknownst to Smith, L.H. was working as a CI for the Anderson Police Department. Smith waited until the two were at an apartment to sell L.H. the heroin. Smith then grabbed L.H. by the arm as she was leaving. L.H. made several excuses to leave, including asking Smith if he would let her leave and return later. L.H. did not scream or ask for help because she knew Smith to carry weapons, and L.H. feared for her safety if she asked for help. Despite L.H.'s efforts to leave the apartment, Smith raped L.H.

[54] Next, we examine Smith's character. According to Smith's PSI, Smith's criminal history includes five misdemeanors and one felony between 2006 and 2014. Smith's offenses range from weapons charges to drug offenses, and at least two offenses involving violence. The trial court acknowledged that Smith's criminal history was not the most extensive the trial court had ever seen; however, the trial court properly used Smith's criminal history as an aggravating factor. *See Rutherford v. State,* 866 N.E.2d 867, 874 (Ind. Ct. App. 2007) ("[A]lthough Rutherford's criminal history is not aggravating to a high degree, it still is a poor reflection on his character."); *see also Pruitt v. State,* 78 N.E.2d 14, 22 (Ind. Ct. App. 2017) (finding that an aggravated and consecutive sentence would have been permissible "based on a single aggravating factor"), *trans. denied.*

[55] Finally, Smith also argues that he is not among the worst offenders; therefore, his sentence is inappropriate. The trial court, however, did not impose the maximum sentences and did not even impose consecutive sentences. Accordingly, Smith's argument that he is not the worst offender and that his below-the-maximum sentence should be reduced is unavailing. Given the nature of the offense and Smith's character, we cannot say that Smith's twelve-year sentence inappropriate.

## Conclusion

[56] In light of the foregoing, the trial court did not abuse its discretion in denying admission of certain evidence; Smith has failed to meet his burden that the deputy prosecutor committed misconduct; the trial court did not abuse its

discretion in instructing the jury; the evidence was sufficient to convict Smith of rape, a Level 3 felony; Smith did not receive ineffective assistance of counsel; and Smith's sentence is not inappropriate. Accordingly, we affirm.

[57] Affirmed.

Mathias, J., concurs.

Riley, J., concurs in result without opinion.